IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

     **Plaintiff,**

         **v.**

GUSTAVO BARBOSA-RODRÍGUEZ [1],
EDUARDO PETERSON-MANUEL [3],
JOSÉ E. SERRANO [5],

     **Defendants.**

**Criminal No.** 17-577 (FAB)

**OPINION AND ORDER**

BESOSA, District Judge.

    Defendants José E. Serrano ("Serrano"), Eduardo Peterson-Manuel ("Peterson"), and Gustavo Barbosa-Rodríguez ("Barbosa") [collectively, "the defendants"] move to dismiss the second-superseding indictment, which charges them with two counts pursuant to the Maritime Drug Law Enforcement Act ("MDLEA"). The defendants argue that the MDLEA violates the United States Constitution on its face, and is unconstitutional as applied to them. (Docket Nos. 47, 49 and 84.) For the reasons set forth below, the motion to dismiss is **DENIED**.

## I.   Background[1]

Beginning in June 2014, "the defendants" and "the captain"
purportedly "planned and financed" a shipment of cocaine from
Colombia to Portugal.  (Docket No. 47 at p. 3.)  The coordination
to repair a boat, the "Odysee II," and acquire the contraband all
took place in Colombia.  Id.  Law enforcement officers gathered
information regarding this drug-trafficking venture by wiretap.[2]
Id.

On October 23, 2014, Her Majesty's Ship ("HMS") Argyll located
the Odyssee II 130 miles southwest of Bermuda.  Id. at p. 2; Docket
No. 83 at p. 2.  A United States Coast Guard Enforcement Detachment
("USCG LEDET") was on board the HMS Argyll.  (Docket No. 47 at
p. 2; Docket No. 83 at p. 2.)  "Law enforcement personnel observed
a United Kingdom flag flying from the vessel."  See Docket No. 52-
1 at p. 1 (Department of State Certification for the Maritime Drug
Law Enforcement Act Case Involving Sailing Vessel Odyssee II
(United Kingdom) Federal Drug Identification Number (FDIN)
2014896019)  ("the Certification").  According to the

---

[1] The following narrative is taken from the common facts in the briefs of the
parties and the certification of the United States Secretary of State.  (Docket
Nos. 47, 83, and 52-1.)  Where facts beyond the indictment are necessary to
determine the motion to dismiss, "a district court may consider [such a motion]
where the government does not dispute the ability of the court to reach the
motion and proffers, stipulates, or otherwise does not dispute the pertinent
facts."  United States v. Musso, 914 F.3d 26, 29-30 (1st Cir. 2019) (quoting
United States v. Weaver, 659 F.3d 353, 355 n* (4th Cir. 2011)).

[2] Defendants allege that the "DEA was listening."  (Docket No. 47 at p. 3.)

Certification, the United States contacted the United Kingdom to confirm or deny the vessel's registry, "and if confirmed, grant authorization to board and search the vessel."  Id.  The Coast Guard boarded the Oydssee II, found contraband, and arrested the two crew members.  (Docket No. 47 at p. 2; Docket No. 83 at p. 2.)

The next day, October 24, 2014, the United Kingdom confirmed the vessel's registry and waived jurisdiction.  (Docket No. 52-1 at p. 1.)

On January 8, 2021, a grand jury returned a two-count second-superseding indictment charging the defendants and others with conspiracy to possess with intent to distribute a controlled substance aboard a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a)(1) and 70506(b) (count one), and with aiding and abetting possession with intent to distribute a controlled substance aboard a vessel subject to the jurisdiction of the United States in violation of 46 U.S.C. § 70503(a)(1) and 18 U.S.C. § 2 (count two).  (Docket No. 20.)[3] In 2022, Colombia extradited Serrano, Peterson, and Barbosa to the United States.  (Docket Nos. 45 and 67.)

---

[3] Defendant(s) charged in the second-superseding indictment remain at large. (Docket No. 38 at p. 1.)  Accordingly, the docket is sealed as to the defendants still at large.  (Docket No. 39.)

## II.  **The Motion to Dismiss**

The defendant's motion to dismiss makes three main arguments. First, the motion argues that the MDLEA is an unconstitutional extension of Congress' power to enact felonies on the high seas as enumerated in Article I, section 8, clause 10 of the United States Constitution as that clause was originally understood and intended. (Docket No. 47 at p. 1.)  Second, as applied to the defendants, the MDLEA only extends to the high seas and no further, and thus is unconstitutional when applied to foreigners operating purely on foreign soil.  Id. at pp. 18-23.  Lastly, the defendants argue that the United States never acquired jurisdiction over the vessel at issue because the United States was not the interdicting authority and Britain's consent was received after the U.S. Coast Guard had already boarded.  Id. at pp. 23-30.

The government argues the MDLEA is a constitutional exercise of Congress' power that has been affirmed repeatedly by the Circuit Courts of Appeals, and that the prosecution of the defendants here is consistent with international law.  (Docket No. 83.)

### A.  **Legal Standard**

Federal Rule of Criminal Procedure 12(b)(1) allows a party to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(1).  The defendants seek to

invalidate a federal statute, invoking "the gravest and most delicate duty that courts are called to perform." Blodgett v. Holden, 275 U.S. 142, 148 (1927) (Holmes, J., concurring). "'Proper respect for a coordinate branch of government' requires that [the Court] strike down an Act of Congress only if 'the lack of constitutional authority to pass the [statute] is clearly demonstrated.'" Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 537 (2012) (quoting United States v. Harris, 106 U.S. 629, 635 (1883)); Mass. v. United States HHS, 682 F.3d 1, 15 (1st Cir. 2012) ("Invalidating a federal statute is an unwelcome responsibility for federal judges; the elected Congress speaks for the entire nation, its judgment and good faith being entitled to utmost respect.").

    The defendants shoulder the burden of proving that the MDLEA is an impermissible exercise of congressional authority. See Heller v. Doe, 509 U.S. 312, 320-21 (1993) (explaining that "'the burden is on the one attacking the legislative arrangement to [negate] every conceivable basis which might support it,' whether or not the basis has a foundation on the record") (citation omitted).  Moreover, the Court presumes that Congress legislates "in accordance with the Constitution." See United States v. Dwinells, 508 F.3d 63, 70 (2007).

**B.    The Maritime Drug Law Enforcement Act**

Drug traffickers "constantly refine their methods for transporting illegal narcotics from country to country." United States v. Carvajal, 924 F. Supp. 2d 219, 224 (D.D.C. 2013); see Lt. CDR Aaron J. Casavant, In Defense of the U.S. Maritime Drug Enforcement Act: A Justification for the Law's Extraterritorial Reach, 8 HARV. NAT'L SEC. J. 191, 200 (2017) ("As the [US Coast Guard] and U.S. Navy (USN) became more adept at disrupting the early methods, [drug trafficking organizations] began using multi-engine speedboats (i.e., "go fast" vessels or GFVs) with the ability to outrun slower law enforcement assets."). "The MDLEA reflects Congress's intention to enable the aggressive prosecution of maritime drug trafficking." United States. v. Dávila-Reyes, 23 F.4th 153, 167 (1st Cir. 2022), reh'g en banc granted, opinion withdrawn, 38 F.4th 288 (1st Cir. 2022).

The MDLEA provides that "an individual [on board a vessel subject to the jurisdiction of the United States] may not knowingly or intentionally:"

> (1)    manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance;

>    (2) destroy (including jettisoning . . .), or
>        attempt or conspire to destroy, property that
>        is subject to forfeiture under section 511(a)
>        of the Comprehensive Drug Abuse Prevention and
>        Control Act of 1970.

48 U.S.C. §§ 70503(a)(1)—(2). Vessels subject to criminal liability include, *inter alia*, ships "registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States." 46 U.S.C. § 70502(c)(1)(C). "Jurisdictional issues arising under the [MDLEA] are preliminary questions of law to be determined solely by the trial judge," and do not constitute an element of the offense. 46 U.S.C. § 70504. A Department of State certification is conclusive proof of a nation's response to a claim of registry. 46 U.S.C. § 70502(d)(2); United States v. Cardales-Luna, 632 F.3d 731, 737 (1st Cir. 2011) (explaining that the Secretary of State designee "need only certify that the 'foreign nation' where the vessel is registered 'has consented or waived objection'" to United States prosecution).

The MDLEA recognizes that "controlled substances aboard vessels is a serious international problem, is universally condemned, and presents a specific threat to the security and societal well-being of the United States." 46 U.S.C. § 70501(c)(1)(C). Congress specified that the MDLEA "applies even though the act is committed outside the territorial jurisdiction

of the United States." 46 U.S.C. § 70503(b). Federal law enforcement officers are ubiquitous on the high seas, "constantly patrolling the Western Hemisphere's major narcotics trafficking vectors with the intent of locating and then boarding those vessels suspected of illicit drug trafficking." Capt. James D. Carlson and Lt. Timothy N. Cronin, Transnational Organized Crime in the Maritime Domain, and Broader Consideration for the United States' Interagency, 4 U. MIAMI NAT'L SEC. & ARMED CONF. L. REV. 43, 47 (2013).

## III. Analysis

### A. Whether Congress Exceeded its Authority Pursuant to the Define and Punish Clause in Enacting the MDLEA

Congress "can exercise only the powers granted to it." McCulloch v. Maryland, 17 U.S. (4 Wheat) 316, 405 (1819) (Marshall, C.J.). "The powers of the legislature are defined and limited; and that those limits may not be mistaken or forgotten, the constitution is written." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176 (1803) (Marshall, C.J.) (invalidating a provision of the Judiciary Act of 1789). At the same time, "[t]he broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution, and such implied powers as are necessary and proper to carry into effect the enumerated powers, is categorically true only in respect of our

internal affairs." United States v. Curtiss-Wright Export
Corp., 299 U.S. 304, 315-16 (1936).

### 1.   The Define and Punish Clause

"Congress did not specify which head of Article I
authority it exercised when enacting the MDLEA or its
predecessor[,]" but "courts have consistently seen the law as
authorized by the Define and Punish Clause . . . ." Eugene
Kontorovich, Beyond the Article I Horizon: Congress' Enumerated
Powers and Universal Jurisdiction over Drug Crimes, 93 MINN. L.
REV. 1191, 1201 (2009). The "Define and Punish clause," grants
Congress the authority to "define and punish Piracies and Felonies
committed on the high seas, and Offences against the Law of
Nations." U.S. CONST. art. I, § 8, cl. 10. This clause has been
interpreted by the Supreme Court to be three separate power
sources, now referred to commonly as "the Piracies clause," "the
Felonies clause," and "the Offences Clause." See United States v.
Bellaizac-Hurtado, 700 F.3d 1245, 1248 (Eleventh Cir. 2012)
(citing United States v. Smith, 18 U.S. (5 Wheat.) 153, 158-59
(1820)).

The defendants argue that the Felonies clause was
intended to authorize Congress to reach only felonies from the
common law of the 18th century. (Docket No. 47 at pp. 6-18.)
Thus, "Congress can only define a felony that's committed in the

high sea as understood by the framers but may not create a whole
new felony altogether." Id. at p. 12.  The defendants state that
Congress understood these felonies to be those associated with
piracy.  Id. at pp. 8-11.  They also assert that the Framers would
have seen the Felonies clause as limited by international law and
therefore constrained by traditional ideas of territorial
jurisdiction, that is, that United States law would only apply to
United States territory and United States nationals.  Id. at
pp. 15-18.

        The government points out that the MDLEA has been
upheld numerous times as constitutional by the First Circuit Court
of Appeals and sister Circuits.  (Docket No. 83 at pp. 5-6.)  The
government does note, however, that most of these cases were
examining whether the statute comported with due process and
international law.  Id.  The First Circuit Court of Appeals did
address the specific argument of Congress' authority pursuant to
the Felonies clause, though it did so on plain error review.  Id.
(citing United States v. Nueci-Pena, 711 F.3d 191, 198 (1st Cir.
2013)).[4]  The government also disputes that the Felonies clause is

---

[4] The issue of whether the MDLEA exceeded Congress' authority pursuant to Article
I was addressed squarely in a "forceful dissent" by Circuit Judge Torruella in
United States v. Cardales-Luna, but the majority did not address the question
due to the posture of the appeal, finding that the constitutional challenge was
not raised below.  See United States v. Cardales-Luna, 632 F.3d 731, 737-38
(1st Cir. 2011).  Judge Torruella wrote that, as applied to the appellants, the
MDLEA was an "*ultra vires* extension of [Congress'] Article I legislative

limited by international law, but argues that even if it were, the MDLEA is consistent with international law.  Id. at pp. 6-14.

        The Define and Punish clause was "among the least controversial in the Constitution.  It represented an incremental and obvious improvement on a similar provision in the Articles of Confederation."  Eugene Kontorovich, The "Define and Punish" Clause and the Limits of Universal Jurisdiction, 103 Nw. U.L. Rev. 149, 159 (2009).  Under the Articles of Confederation, however, Congress had lacked power to define the substance of the offenses, and therefore varying state common laws had to be applied leading to inconsistent application of the law.  Id. at p. 161-62.  The Framers thus entrusted Congress to define "felonies" within the context of Article I "[f]or the sake of certainty and uniformity."  THE FEDERALIST NO. 42, at 262 (James Madison) (Clinton Rossiter ed., 1961).  On a concern by Gouverneur Morris, a delegate to the Constitutional Convention, that the word "define" would mean "limited to the preexisting meaning," "he was reassured by 'others' that the draft's term was 'applicable to the creating of offences also, and therefore suited the case both of felonies & of piracies.'"  Eugene Kontorovich, The "Define and Punish" Clause at 163 n.65 (quoting 2 The Records of the Federal Convention of 1787,

---

powers to foreign territory, as applied to persons and/or activities that have no nexus with the United States."  Id. at 739 (Torruella, J., dissenting).

at 316 (Max Farrand ed., 1911)).  Justice Story, in one of the first Supreme Court cases interpreting this clause, noted that the phrase "felonies committed on the high seas" is "necessarily somewhat indeterminate" and is not a term "used in the criminal jurisprudence of the admiralty in the technical sense of the common law."  United States v. Smith, 18 U.S. (5 Wheat) 153, 159 (1820).

Nothing the defendants point to indicates a clear intention that the meaning of "felony" stay fixed to what was a felony at common law in the 18th century; in fact the reverse is more true- that the term felony had an undefined and flexible meaning.  See Kontorovich, The "Define and Punish" Clause at 163 n.65; Smith, 18 U.S. (5 Wheat) at 159.  Expanding out from the initial felonies that did often accompany pure piracy, by "1820[,] Congress went further than it or any other nation had ever gone before by declaring the slave trade a form of piracy punishable by death."[5]  Kontorovich, The "Define and Punish" Clause at 194.

### 2.  International Law and the Felonies Clause

There is evidence that the Framers intended international law to be a limit on Congress' power when invoking the Felonies clause.  Cf. Davila-Reyes, 23 F.4th at 176 ("it [is]

---

[5] Making matters even more confusing in divining the intention of the "original" meaning of the Felonies clause is that the word 'piracy' was used during this period to describe not only true piracy, that is, robbery on the high seas, but also to describe "a variety of maritime crimes," the so-called 'municipal' or 'statutory piracies.'  Kontorovich, The "Define and Punish" Clause at 166.

apparent that the Framers viewed international law as a restraint on Congress' enumerated powers bearing on foreign relations.") (withdrawn opinion); see also Kontorovich, The "Define and Punish" Clause at 182 (recounting how Justice Marshall, then a freshman House representative, gave a speech from the Congress floor stating: 'It is not true that all nations have jurisdiction over all offences committed at sea. On the contrary, no nation has any jurisdiction at sea, but over its own citizens or vessels, or offences against itself.'"). At the same time, "felony on the high seas" is not an international law concept. Cf. Smith, 18 U.S. (5 Wheat) at 159. Kontorovich explains the "[i]n another early case interpreting this section of the constitution, Chief Justice Marshall "did not clearly disentangle the international and constitutional strands." Kontorovich, The "Define and Punish" Clause at 197.

Regardless of the extent of international law as a cabin on the power of Congress pursuant to the Felonies clause, the MDLEA only asserts power over foreign defendants on foreign vessels with the consent of their flag state, a valid means of establishing jurisdiction pursuant to international law as understood at the time of the founding.[6] See The Schooner Exchange

---

[6] The MDLEA does provide jurisdiction over stateless vessels, and one manner of establishing statelessness pursuant to the statute is currently in dispute in this Circuit. See Davila-Reyes, 23 F.4th at 176, reh'g en banc granted, opinion

v. McFadden, 11 U.S. (7 Cranch) 116, 136 (1812) ("The jurisdiction
of the nation within its own territory is necessarily exclusive
and absolute . . . All exceptions, therefore, to the full and
complete power of a nation within its own territories, must be
traced to the consent of the nation itself") (Marshall, C.J.);
Kontorovich, The "Define and Punish" Clause at 172 (describing the
understanding of jurisdiction at the time of the founding as
"heavily territorial" from "the principle that a nation's
jurisdiction is an outgrowth of its sovereignty and that its
sovereignty is territorial. Thus, no nation could have
jurisdiction outside its sovereign domain *except with the consent
of another nation*.") (emphasis added).

        Because there is no strong evidence that the
Felonies clause is to be read as strictly as the defendants
propose, the presumption that Congress has acted constitutionally
is not overcome. See Dwinells, 508 F.3d at 70.

### B. Whether Congress Can Reach Conduct that did not Occur on the High Seas

        The two-count second-superseding indictment charges
Serrano, Peterson, Barbosa, and other defendants with conspiracy
to possess with intent to distribute a controlled substance aboard

withdrawn, 38 F.4th 288 (1st Cir. 2022). As this issue is not relevant to the
defendants' motion, the Court speaks in general terms about the reach of the
MDLEA to foreign defendants on foreign vessels.

a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a)(1) and 70506(b) (count one), and with aiding and abetting possession with intent to distribute a controlled substance aboard a vessel subject to the jurisdiction of the United States in violation of 46 U.S.C. § 70503(a)(1) and 18 U.S.C. § 2 (count two).  (Docket No. 20.)

The defendants argue that neither the conspiracy count nor the aiding and abetting count are authorized by the Constitution, as they never left solid ground in Columbia and Congress is only authorized to define felonies on the "high seas." (Docket No. 47 at pp. 18-25.)  The government argues the Court should follow persuasive precedent from sister jurisdictions finding the extraterritorial application of the MDLEA to foreign conspirators constitutional.  (Docket No. 83 at pp. 14-16.)

Because the defendants' arguments for conspiracy and aiding and abetting are different, as is the function of each law, the Court will address the conspiracy count and the aiding and abetting count separately.

### 1.   Conspiracy

The defendants state that they are only accused of "facilitate[ing] financing and establish[ing] the contacts

necessary for Geul[7] to repair the boat, and to obtain the cargo," none of which is traveling on the high seas possessing narcotics. (Docket No. 47 at p. 18-19.)   The defendants point out that Congress did not state explicitly in the section describing the punishment for conspiracy that it applies extraordinarily.   Id. at p. 19.

Section 70503(b), "Extension beyond territorial jurisdiction," explicitly states that the prohibited acts listed in section 70503 are subject to the law "even though the act is committed outside the territorial jurisdiction of the United States."   46 U.S.C. § 70503(b).   Liability for conspiracy to violate the MDLEA is not included in section 70503; it is inferred, however, from the penalties portion of the statute, which states that "A person attempting or conspiring to violate section 70503 of this title is subject to the same penalties as provided for violating section 70503."   Id. at § 70506(b).   The first question is thus whether the extraterritorial clause in the substantive part of the statute applies to conspiracies to violate the law, as the statute is essentially silent as to this inchoate offense.

---

[7] It is not clear to the Court who Geul is, though he may be "the captain" as the defendants write "other than Geul and his sailing mate" suggesting Geul is the person who sailed the Odyssee II.  (Docket No. 47 at p. 19.)  As this fact is not necessary the Court just notes the ambiguity.

### a.    Statutory Interpretation

"Although there is a presumption that Congress does not intend a statute to apply to conduct outside the territorial jurisdiction of the United States, that presumption can be overcome when Congress clearly expresses its intent to do so."  United States v. Yousef, 327 F.3d 56, 86 (2d Cir. 2003) (citing Foley Bros. v. Filardo, 336 U.S. 281, 285 (1949)); RJR Nabisco, Inc. v. European Cmty, 136 S. Ct. 2090, 2100 (2016) ("Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application.").  "When a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms,'"  Morrison v. National Australia Bank Ltd., 561 U.S. 247, 264 (2010).

In general, however, "aiding and abetting[ ] and conspiracy ... have been deemed to confer extraterritorial jurisdiction to the same extent as the offenses that underlie them."  United States v. Hill, 279 F.3d 731, 739 (9th Cir. 2002); United States v. Ballestas, 795 F.3d 138, 144 (D.C. Cir. 2015) ("Here, because the substantive offense established in § 70503(a) applies extraterritorially, we conclude that conspiracy to commit that substantive offense under § 70506 also has extraterritorial reach.").  Interpreting the extraterritorial

clause to apply to conspiracies is also consistent with Congress'
purpose, because "Congress enacted the MDLEA to enhance the
government's ability to prosecute members of drug trafficking
organizations.  [Restricting the application of the MDLEA] would
effectively inoculate many members of such organizations—including
organizations targeting the United States—against prosecution."
Ballestas, 795 F.3d at 145; cf. United States v. MacAllister, 160
F.3d 1304, 1308 (Eleventh Cir. 1998) ("Logic dictates that Congress
would not have passed a drug conspiracy statute that prohibits
international drug smuggling activities, while simultaneously
undermining the statute by limiting its extraterritorial
application.")

### b.   International Law and "Charming Betsy"

The defendants argue that interpreting the
MDLEA to apply extraterritorially to conspiracy violates
international law and thus such a construction should be avoided
under the canon of construction known as "Charming Betsy." (Docket
No. 47 at p. 21.)  The "Charming Betsy" canon simply states that
"an act of [C]ongress ought never to be construed to violate the
law of nations, if any other possible construction remains."  See
United States v. Robinson, 843 F.2d 1, 2–3 (1st Cir. 1988) (quoting
The Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118 (1804)
(Marshall, C.J.).

Applying the MDLEA extraterritorially to a foreign land-based conspiracy can be justified, however, under the territorial principle of international law.  In a non-MDLEA context, the Eleventh Circuit Court of Appeals examined whether a Canadian member of a conspiracy to export cocaine from the United States, who had never traveled to the United States and only orchestrated the financing and logistics from Montreal, could be subject to United States jurisdiction.  United States v. MacAllister, 160 F.3d 1304, 1305 (Eleventh Cir. 1998).  After determining that the criminal statute at hand did reach extraterritorially, the court "consider[ed] whether doing so would violate general principles of international law."  Id. at 1308.  The court found that it would not, based on "the objective territorial principle," which "applies where the defendant's actions either produced some effect in the United States, or where he was part of a conspiracy in which any conspirator's overt acts were committed within the United States' territory."  MacAllister, 160 F.3d at 1308 (citing United States v. Baker, 609 F.2d 134, 138 (5th Cir. 1980)).  Because other conspirators had committed acts in furtherance of the conspiracy within the territory of the United States, the court found that the prosecution was permitted pursuant to international law.  Id.

The territorial principle provides that "a state may exercise jurisdiction with respect to all persons or things within its territory." Benedict on Admiralty, § 112(a)(3) (2019) (hereinafter, "Benedict"). Pursuant to the territorial principle, "ships on the high seas are regarded as [the] territory of their flag state and placed under the exclusive jurisdiction of the latter by customary international law." Id. § 112(a)(4); United States v. Arra, 630 F.2d 836 (1st Cir. 1980) ("Vessels have the nationality of the nation whose flag they are entitled to fly . . . and are subject to [that] nation's jurisdiction when on the high seas.").

Pursuant to First Circuit Court of Appeals precedent, territorial jurisdiction attaches to a foreign vessel if the flag country provides consent. See United State v. Robinson, 843 F.2d 1, 4 (1st Cir. 1988) (Breyer, J.) ("It is clear, under international law's 'territorial principle,' that a 'state has jurisdiction to prescribe and enforce a rule of law in the territory of another state to the extent provided by international agreement with the other state.") (citing RESTATEMENT (SECOND) OF FOREIGN RELATIONS LAW OF THE UNITED STATES §25 (1965)). The 1988 United Nations Convention Against Illicit Traffic in Narcotic Drug and Psychotropic Substances ("1988 Convention"), U.N.T.S. 27627 (1988) also implicitly endorses flag state consent in Article 4, providing

that a party may "establish its jurisdiction over [drug-trafficking] offenses . . . which that Party has been authorized to take appropriate action pursuant to article 17." 1988 Convention art. 4(b)(ii).

Thus, overt acts that were committed on the vessel, which becomes subject to United States territorial jurisdiction through consent, extend territorial jurisdiction to the conspirators on land. Cf. MacAllister, 160 F.3d at 1308; Robinson, 843 F.2d at 4. There is thus no conflict with international law in interpreting the MDLEA to apply to extraterritorial conspirators.

### c. Jurisdictional Basis

The defendants' larger argument seems to be that the MDLEA's jurisdictional basis only extends to the high seas, and thus cannot authorize Congress to criminalize their conduct strictly on land. (Docket No. 47 at p. 20-21.) The government argues the Court should follow precedent from sister Circuit Courts of Appeals finding the extraterritorial application of the MDLEA to foreign conspirators constitutional. (Docket No. 83 at pp. 14-16.)

The source of Congress' power to criminalize the completely foreign domestic acts of foreign defendants pursuant to the MDLEA is an open question. See Ballestas, 795

F.3d at 147 (holding that the Felonies clause in combination with conspiracy law provides Congress' authority); United States v. Alarcón Sánchez, 972 F.3d 156, 167-68 (2d Cir. 2020) (power comes from the Necessary and Proper clause); cf. United States v. Bellaizac-Hurtado, 700 F.3d 1245 (Eleventh Cir. 2012) (rejecting the 'Law of Nations' clause as authority for application of MDLEA outside of the high seas); United States v. Dávila-Mendoza, 972 F.3d 1264, 1268-69 (Eleventh Cir. 2020) (rejecting the Foreign Commerce Clause and the Necessary and Proper Clause for the same reason); see also Ryan R. Babb, Foreign Territorial Sea-Zures: Article I Supports the Application of the Maritime Drug Law Enforcement Act to Drug Trafficking Within Foreign Territorial Seas, 74 Fla. L. Rev. 345 (2022).

### i. Felonies Clause and Conspiracy Law

In United States v. Ballestas, the District of Columbia Circuit Court of Appeals found that a conspirator who had never been on "the high seas" could still be reached by the Felonies clause because the acts of the crew, his admitted co-conspirators, were committed on the high seas and therefore could be attributed to him through "the established principles of conspiracy law." Ballestas, 795 F.3d at 147 (citing Pinkerton v. United States, 328 U.S. 640, 647 (1946)). The court held then that "[t]he Felonies Clause therefore provides Congress

with authority to 'punish' Ballestas for his role in that conspiracy." Id.; see also United States v. Carvajal, 924 F. Supp. 2d 219, 259-60 (D.D.C. 2013), aff'd sub nom. United States v. Miranda, 780 F.3d 1185 (D.C. Cir. 2015) (finding that "the Constitution permits criminalization of the offenses charged" where on land conspirators were prosecuted pursuant to the MDLEA because conspiracy was a recognized offense "in England well prior to the drafting of the United States Constitution[,]" "a conspirator will be held vicariously liable for the offense committed by his or her coconspirators[,]" and "co-conspirators committed a substantive offense, possession of narcotics on board a stateless vessel on the high seas, which indisputably would be both within this Court's jurisdiction and the ambit of the Felonies on the High Seas Clause.").

Based on the facts accepted as true for purposes of deciding this motion, the defendants and "the captain" conspired to move cocaine on the high seas aboard the Odyssee II. (Docket No. 47 at p. 3.)  If the captain was on board the vessel, then the facts here are identical to those in Ballestas.  See Ballestas, 795 F.3d at 147.  The Court finds that the Felonies clause, in operation with conspiracy law, provides Congress the power to criminalize conspiracies to violate the MDLEA.  See id.

### ii.  **Necessary and Proper Clause**

If the operation of conspiracy law in combination with the Felonies clause were not sufficient to supply Congress the power to criminalize the defendant's conduct here, the Necessary and Proper clause may provide such authority.  See U.S. Const. Art. I, § 8, cl. 18.  The Necessary and Proper Clause states that "Congress shall have Power ... To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."  Id.  "[I]n determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power."  United States v. Comstock, 560 U.S. 126, 134 (2010).  In United States v. Alarcón Sánchez, the Second Circuit Court of Appeals found that "prosecuting MDLEA conspirators who are not on the high seas is a means that is rationally related to the legitimate end of prosecuting MDLEA conspirators who are on the high seas" and thus "Congress has not exceeded its authority under the Necessary and Proper Clause in extending the MDLEA to cover the conduct of land-based conspirators."  972 F.3d 156, 168 (2d Cir. 2020).

### iii. Foreign Commerce Clause

The Foreign Commerce Clause offers a potential other source for Congress' power over foreign defendants' actions on purely foreign soil. "Congress has broad power under Article I, § 8, cl. 3, '[t]o regulate Commerce with foreign Nations,' and [the Supreme] Court has repeatedly upheld its power to make laws applicable to persons or activities beyond our territorial boundaries where United States interests are affected." Hartford Fire Ins. Co. v. California, 509 U.S. 764, 813-14 (1993). "[T]he Supreme Court has never clearly articulated the bounds of the positive foreign commerce power[,]" however, and "jurisprudence addressing Congress's positive Foreign Commerce Clause power is sparse." United States v. Dávila-Mendoza, 972 F.3d 1264, 1270 (Eleventh Cir. 2020).

The Eleventh Circuit Court of Appeals examined whether the Foreign Commerce Clause could be the source of Congress' power in applying the MDLEA in the territorial waters of other countries to foreign defendants, and for the sake of analysis assumed without deciding "that the Foreign Commerce Clause has the same scope as the Interstate Commerce Clause." Dávila-Mendoza, 972 F.3d at 1271. Looking to the Supreme Court's precedent on the Interstate Commerce Clause, then, the court explained that "Congress's power under the Foreign Commerce Clause

includes at least the power to regulate the 'channels' of commerce
between the United States and other countries, the
'instrumentalities' of commerce between the United States and
other countries, and activities that have a 'substantial effect'
on commerce between the United States and other countries." Id.
(quoting United States v. Baston, 818 F.3d 651, 668 (Eleventh Cir.
2016)).

Courts reviewing whether activities in
the aggregate have a 'substantial effect' need only find that there
is "a 'rational basis'" for so concluding." See Gonzales v. Raich,
545 U.S. 1, 22 (2005). The Dávila-Mendoza court held that the
record did not support a conclusion that drug-trafficking "in the
territorial waters of a foreign nation, by foreign nationals using
a foreign-registered vessel, of drugs not bound for the United
States, substantially affects United States commerce with foreign
nations" and that the government's argument that foreign drug
trafficking could impact United States commerce with foreign
nations was too attenuated of an inference chain. Dávila-Mendoza,
972 F.3d at 1276.

This Court is not wholly persuaded by
that conclusion, however, and other courts have come to the
opposite conclusion in analogous circumstances. In United States
v. Bollinger, the Fourth Circuit Court of Appeals analyzed a

statute criminalizing engaging in non-commercial illicit sexual acts with a minor after traveling in foreign commerce and held that there was a rational basis for determining that it affected foreign commerce.  798 F.3d 201, 218 (4th Cir. 2015).  The court explained that permitting such acts would affect the development of child sex tourism, especially in developing countries who are under "economic pressure to develop tourism."  Id. (quoting H.R. Rep. 107-525, 2002 WL 1376220 at *2-3).  The court noted that the law "is part of a larger regulatory scheme designed to close loopholes that facilitated the abuse of children abroad by sex tourists" and that Congress found that the "preexisting law failed to deter commercial sex tourists, necessitating [this new section]."  Id. at 219.  The court also observed that "the international community has suggested the need for a 'holistic approach' to combat forms of commercial sexual exploitation like child prostitution and child pornography—a holistic approach that includes non-commercial regulations."  Id. at 218 (citing an international treaty to which the United States was a signatory).

Like the statute at stake in Bollinger, Congress could rationally conclude that not extending its reach to conspirators on land would allow drug trafficking to flourish in countries with limited resources to combat the problem.  Cf. Bollinger, 798 F.3d at 218.  The 1988 Convention lists as its first

concern that the production of, demand for, and traffic of narcotic
drugs "adversely affect the economic, cultural and political
foundations of society," and each party to the convention commits
to criminalizing in its domestic law, "subject to its
constitutional principles and the basic concepts of its legal
system," "conspiracy to commit . . . and aiding, abetting,
facilitating and counselling the commission of any of the offenses"
listed in Article 3, "Offences and Sanctions." 1988 Convention
introduction & art. 3.  And just as the statute in question in
Bollinger was intended to close jurisdictional loopholes,
"[b]efore the MDLEA's enactment, when the Coast Guard seized
illegal drug shipments, the government could not 'prosecute the
crew *or others involved in the smuggling operation*' in the absence
of often elusive evidence that the drugs were destined for the
United States."  Ballestas, 795 F.3d at 145 (quoting S.Rep.
No. 96855, at 2 (1980), *reprinted in* U.S.C.C.A.N. 2785, 2786
(July 16, 1980)) (emphasis added in original).

There are considerable jurisdictional
differences between the law at issue in Bollinger and the MDLEA,
however, and because it is not necessary to determine the exact
scope of the Foreign Commerce Clause at this time, the Court will
simply note that the Foreign Commerce Clause is a plausible basis

for Congress' authority to criminalize extraterritorial conspiracies.

The Court thus finds that the application of the MDLEA to foreign on land conspirators is constitutional.

### 2.   Aiding and Abetting

Count Two of the indictment charges the defendants with aiding and abetting, which is also not a substantive offense of the MDLEA but is forbidden by a separate federal criminal statute, 18 U.S.C. section 2, which states that

(a) [w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) [w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. § 2.

As to aiding and abetting, the defendants do not dispute that "aiding and abetting liability extends insofar as the underlying statute's reach extends." (Docket No. 47 at p. 22.) They contend, however, that aiding and abetting conduct must occur on the high seas, as this "is as far as the MDLEA reaches." Id.

### Whether Aiding and Abetting Must Occur on the High Seas

The MDLEA prohibits those "on board a covered vessel" from possessing, manufacturing, or distributing controlled substances. 46 U.S.C. §70503(a). But "proving a defendant guilty of aiding and abetting does not ordinarily require the government to establish 'participation in each substantive and jurisdictional element of the underlying offense.'" United States v. Ali, 718 F.3d 929, 939 (D.C. Cir. 2013) (quoting United States v. Garrett, 720 F.2d 705, 713 n. 4 (D.C. Cir. 1983)). "[T]o prove that a defendant is liable as an aider and abettor, the government must prove 'that: 1) the substantive offense was actually committed [by someone]; 2) the defendant assisted in the commission of that crime or caused it to be committed; and 3) the defendant intended to assist in the commission of that crime or to cause it to be committed.'" United States v. Gaw, 817 F.3d 1, 7 (1st Cir. 2016) (quoting United States v. Davis, 717 F.3d 28, 33 (1st Cir. 2013)). Therefore, there is no requirement that an aider and abettor also be "on board a covered vessel." See Gaw, 817 F.3d at 7; see also Ali, 718 F.3d at 941 (analyzing whether a defendant could aid and abet piracy from territorial waters, the court explained that "[w]hile the offense he aided and abetted must have involved acts of piracy committed on the high seas, his own criminal liability

is not contingent on his having facilitated these acts while in international waters himself.")

### 3.   Fifth Amendment/Due Process

The defendants next argue that, without a connection to the United States, "either by his acts, or his nationality," the Fifth Amendment to the United States Constitution limits personal jurisdiction over defendants for aiding and abetting.  (Docket No. 47 at p. 22.)  The First Circuit Court stated in United States v. Cardales "that due process does not require the government to prove a nexus between a defendant's criminal conduct and the United States in a prosecution under the MDLEA when the flag nation has consented to the application of United States law to the defendants."  168 F.3d 548, 553 (1st Cir. 1999).  This holding does not squarely apply to the defendants, however, who were not on the vessel whose flag state consented to United States law.  See Docket No. 47 at p. 18-19.  The Cardales court did explain, however, that "[t]o satisfy due process, our application of the MDLEA must not be arbitrary or fundamentally unfair."  Cardales, 168 F.3d at 553 (citing United States v. Martínez-Hidalgo, 993 F.2d 1052 (3d Cir.1993)).  In Martínez-Hidalgo, the Third Circuit Court of Appeals concluded that "[i]nasmuch as the trafficking of narcotics is condemned universally by law-abiding nations, we see no reason to conclude

that it is 'fundamentally unfair' for Congress to provide for the
punishment of persons apprehended with narcotics on the high seas."
Martínez-Hidalgo, 993 F.2d at 1056; see also United States v.
Aybar-Ulloa, 987 F.3d 1, 14 (1st Cir. 2021), cert. denied, 210 L.
Ed. 2d 878 (June 1, 2021) ("'fair warning' has certainly been given
in the case of drug trafficking . . . drug trafficking has long
been regarded as a serious crime by nearly all nations."); Ali,
718 F.3d at 944-46 (finding due process was satisfied because
defendant was on notice that his acts were condemned and subject
to prosecution due to a global treaty against hostage taking).  As
in those cases, the defendants cannot say that it is fundamentally
unfair for the United States to prosecute them when trafficking
narcotics is condemned by the 1988 Convention and a bilateral
agreement between the United States and Colombia "to suppress
illicit traffic by sea."  See Aybar-Ulloa, 987 F.3d at 14; 1988
Convention; Agreement between the Government of the United States
of America and the Government of Colombia to Suppress Illicit
Traffic by Sea, TIAS 12835 (1997).

    **4.    Whether the United States Can Assert Jurisdiction
When a British Ship Interdicted the Suspect Vessel**

The defendants next argue that the United States
could never acquire territorial jurisdiction over the Odyssee II
because it was interdicted by a British vessel, and pursuant to

Articles 110 and 111 of the United Nations Convention on the Law of the Seas (UNCLOS), jurisdiction is tied to the nationality of the ship that encounters the non-compliant vessel. (Docket No. 47 at pp. 23-25.)  The defendants' argument seems to be that the United States could not have sought consent from the United Kingdom because to do so it would need to have been the one who approached the Odyssee II.  Id. at p. 24.

The government points out that this argument has already been rejected by this Court in United States v. Gutiérrez-Moreno, No. 21-245, 2022 WL 2827462, at *6 (D.P.R. July 20, 2022) (Besosa, J.).  (Docket No. 83 at pp. 19-20.)  Articles 110 and 111 of UNCLOS do not lend support to the idea that the interdicting ship cannot consent to the jurisdiction of the United States.  See UNCLOS Articles 110 and 111; see also United States v. Green, 671 F.2d 46, 52 (1st Cir. 1982) (holding that the Convention on the High Seas and federal statutes provide "ample authority for the Coast Guard to board and search a foreign flag vessel [in international waters] when the flag state consents.").

**5.  Whether the United States has Jurisdiction if it did not get Consent Until After it Boarded the Suspect Vessel**

The defendants also argue that the United States would have needed to acquire consent to jurisdiction before boarding, otherwise there is no territorial basis for asserting

jurisdiction.  (Docket No. 47 at p. 25-26.)  The government points out the myriad authority rejecting this position.  (Docket No. 83 at p. 20.)

The First Circuit Court of Appeals has "upheld jurisdiction under the MDLEA that was established when response from the claimed nation of registry was received five days after the vessel was boarded."  United States v. Mitchell-Hunter, 663 F.3d 45, 50 n.7 (1st Cir. 2011) (describing Cardales, 168 F.3d at 551-52); see also United States v. Bustos-Useche, 273 F.3d 622, 627 (5th Cir. 2001) ("exact timing of a flag nation's permission is not a condition to consent under subsection (c)(1)(C)."); United States v. Greer, 285 F.3d 158, 175-76 (2d Cir. 2002) (holding that "consent under the MDLEA can relate back to activity that occurred before consent"); United States v. Juda, 46 F.3d 961, 966 (9th Cir. 1995) ("[W]hen MDLEA jurisdiction is premised on consent of the flag nation, such consent relates back to activity that occurred prior to consent.").

There is thus no valid basis to challenge the United States' jurisdiction over the defendants.

## IV. Conclusion

For the reasons set forth above, the motion to dismiss the indictment is **DENIED**.  (Docket Nos. 47, 49 and 84.)

**IT IS SO ORDERED.**

San Juan, Puerto Rico, June 28, 2023.

                              s/ Francisco A. Besosa
                              FRANCISCO A. BESOSA
                              SENIOR UNITED STATES DISTRICT JUDGE